THE STATE OF OHIO, APPELLEE, v. SCHULTZ, APPELLANT.

(No. 83AP-757 — Decided March 19, 1985.)

*Michael Miller,* prosecuting attorney, and *Karen L. Martin,* for appellee.

*J. Boyd Binning,* for appellant.

MOYER, J. This case is before us on defendant-appellant's appeal from a judgment of the Common Pleas Court of Franklin County, finding defendant, Edward S. Schultz, guilty of one count of drug abuse, *i.e.,* possession of cocaine (R.C. 2925.11). Defendant's motions to suppress evidence and statements obtained by Columbus police officers having been overruled by the trial court, judgment was found upon defendant's plea of no contest.

At approximately 4:00 a.m., March 23, 1983, several Columbus police officers executed a search warrant to search the residence of Mr. and Mrs. Daniel Romuno for cocaine. Defendant was known to have been at this residence since 8:30 the previous evening, although he was not a regular resident. The officers had previous information from an officer of the New York State Police that defendant was known to carry a weapon. They also had information from J & J Security at the Columbus Airport that two subjects, one of whom was defendant, had several times boarded planes to Florida while carrying large amounts of cash. The officers had not applied for a search warrant on defendant as an individual because they did not believe that defendant brought cocaine into the house on that evening.

When the officers entered the premises, they secured the four occupants (the Romunos, their two year old, and defendant); they handcuffed defendant, brought him downstairs, and seated him in a chair for the duration of the search. The handcuffing was performed for security reasons, *i.e.,* for the safety of the officers and others on the premises. The officers testified that weapons are very often involved in or found during drug traffic arrests, and that, in fact, four guns were found during the search that evening. With the additional knowledge of defendant's propensity to carry weapons, referred to above, the officers felt that his restraint was necessary to permit the safe and swift execution of the search warrant.

The search lasted approximately one hour and fifteen minutes; defendant remained handcuffed throughout. In the process of searching the premises, the officers found a coat in a downstairs closet as they were searching several coats. They asked defendant if that particular coat was his, and he replied in the affirmative; an officer then reached into the pockets of the coat, where he found white paper folded around a white powder which appeared to be cocaine. The officer asked defendant if that was his cocaine, to which he replied that it was. At that point, defendant was informed that he was under arrest. He had not been placed under arrest previous to that time, and he had not been read his *Miranda* rights before the officers asked him about the coat.

Defendant has raised the following two assignments of error:

"1. The search of the defendant's coat, conducted by police officers, was unreasonable and in violation of the defendant's Fourth and Fourteenth Amendment rights under the United States Constitution. For this reason the trial court erred in denying the defendant's motion to suppress evidence.

"2. The defendant was interrogated

by Columbus police officers without benefit of Miranda warnings and subsequent to an unlawful arrest in violation of the defendant's Fourth, Fifth and Fourteenth Amendment rights under the United States Constitution. For this reason the trial court erred in denying the defendant's motion to suppress the statements made by defendant."

In his first assignment of error, defendant argues that the contraband evidence obtained from his coat should have been suppressed, as it resulted from an illegal search and seizure. To support his allegation that the search was unreasonable, defendant relies upon the following theories: first, that his detention and restraint, *i.e.,* being in handcuffs, was too long in duration to qualify as the brief stop and frisk envisioned by the court in *Terry* v. *Ohio* (1968), 392 U.S. 1 [44 O.O.2d 383]. He alleges that this invasion of his privacy was, in effect, an illegal arrest, rather than merely an investigative stop. Second, defendant argues that, whatever security reasons caused the officers to handcuff defendant, there was no safety motive behind the search of his coat and the search was conducted solely for the purpose of locating contraband.

Defendant cites *Sibron* v. *New York* (1968), 392 U.S. 40 [44 O.O.2d 402], in support of his argument that the mere presence of an individual in a place where criminal activity is suspected is not sufficient justification to seize and search that person. He further relies upon *Ybarra* v. *Illinois* (1979), 444 U.S. 85, and this court's decision in *State* v. *Croft* (Apr. 1, 1982), Franklin App. No. 81AP-803, unreported, for the proposition that a warrant to search premises may not be extended to search those who are simply found therein.

The defendants in *Ybarra* and *Croft* were both merely patrons at public establishments, and were detained and searched without any further reason for the police to believe they had any particular connection to either the premises or the criminal activity suspected at the establishment. *Ybarra* is often cited for the proposition that a search of the premises may not be extended to search persons found on the premises, absent probable cause, or at least sufficient reason, to believe the person is presently armed and dangerous. These cases may easily be distinguished from the case before us. The defendant in the case before us was in a private home, rather than a public establishment; he was apparently staying at least overnight in the house, rather than being a transitory passerby; the police in *Ybarra* and *Croft* had no previous knowledge of the defendants, whereas in this case the police had prior information from a named officer of the New York State Police that defendant carried weapons and was thought to be engaged in drug trafficking.

The above reasons would appear to meet the minimal requirements set forth in *Ybarra* that the police must have had reason to believe that defendant was armed and dangerous, even though they might temporarily have curbed his potential to harm them or others in the house. *Sibron, supra,* upon which defendant places much reliance, refers to *Terry* v. *Ohio, supra,* to indicate that a search may legitimately be extended from premises to persons if the police officer is "able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." *Sibron, supra,* at 64. The facts set forth above, which are repeated throughout the record, are sufficiently specific to meet this criterion and to justify a personal search, had one actually been made.

The fact remains, however, that the officers, although justifiably restraining defendant for safety reasons, made no search of his actual person but merely searched his coat, which was removed from his person and hanging in a closet

with other garments. This is a significantly less intrusive official act than a search of the person or a *Terry*-type pat down, acts which themselves were not considerd tantamount to an illegal arrest. Therefore, it would appear that defendant was not held under illegal arrest by being placed under detention during the execution of the search warrant, which involved the search not of his person, but of his coat, and while his coat was some distance from him.

Defendant has argued that his detention, and the search of his coat, are not justified under the authority of a warrant to search the premises, as he was not a resident of the apartment. *Michigan* v. *Summers* (1981), 452 U.S. 692, is referred to by both the defendant and the state in their briefs. That case held that a warrant to search premises for contraband implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted. *Id.* at 705. Defendant attempts to restrict this opinion to mean that only the actual owner of the premises could be detained; thus, defendant, as a visitor, could not be stopped. A strict application of this interpretation of the law would allow the police to detain only the titular owner of a residence, allowing all others occupying the premises for any period of time to escape.

Although it is not perfectly clear in what sense the court originally intended the word "occupant" to be understood, it would appear to embrace more than merely the owner of a residence. The issue becomes whether there is such a relationship between the premises and the detained individual that the police may make a reasonable connection between the person and his property within the house. *Michigan* speaks also of the balance to be struck between the level of intrusion upon the defendant and the justification for that intrusion. The court

described detention as "only an incremental intrusion on personal liberty" when the search of a private dwelling had already been authorized by a valid warrant. *Michigan, supra,* at 703. That case balanced the less than substantial intrusion involved against the important justification of the police interests in controlling drug traffic, preserving evidence, and in preventing harm to police or other occupants. In the case before us, these interests, combined with the "articulable facts" which enabled the police to know of defendant's suspected connection to the drug traffic, tendency to carry weapons, and location for at least overnight in the apartment to be searched, justify the detention of defendant during the search.

Several federal circuits are now using a test which focuses upon the visitor's relation to the premises as it affects the scope of the search warrant. This is applied so that a mere passerby would not be subject to search due to propinquity alone, but a visitor whose stay was of some duration would be deemed to have sufficient relation to the premises so that he, or at least his property, would come within the ambit of the warrant. See *United States* v. *Micheli* (C.A. 1, 1973), 487 F. 2d 429; see, also, *United States* v. *Hilton* (N.D. Me. 1979), 469 F. Supp. 94, in which a visitor whose stay had been overnight, as was defendant's visit in the case before us, was subject to the search of his belongings.

The search of defendant's coat, which was hanging in the closet, also appears to be justified under the authority of the warrant. The state has cited *United States* v. *Ross* (1982), 456 U.S. 798, in support of premises searches extended to persons. Although much of *Ross* may be distinguished from the situation in this case, as *Ross* involved a car stop and a warrantless search of the trunk of the car, *Ross* does contain the following significant language:

"A lawful search of fixed premises

generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. * * * When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, * * * must give way to the interest in the prompt and efficient completion of the task at hand." *Id.* at 820-821.

The warrant to search the apartment clearly extended to a search of the closets therein, which would necessarily involve searching the garments contained within them for the contraband which was the object of the warrant. The federal case of *United States* v. *Johnson* (C.A.D.C. 1973), 475 F. 2d 977, held that a pre-arrest search of a defendant's purse, which was not being worn at the time, was not a search of her person and was within the scope of a warrant to search the apartment in which she was found.

Defendant's detention, and his restraint for safety reasons, at the apartment did not amount to an illegal arrest, nor was the search of his belongings during his detention beyond the scope of the warrant issued. For the above reasons, the trial court did not err in refusing to suppress the evidence obtained from this search. The first assignment of error is overruled.

Defendant's second assignment of error focuses upon the statements made by defendant to the officers concerning the identification of his coat and of the cocaine found in it. He alleges that the statements were made without benefit of *Miranda* warnings, and were made while he was subject to unlawful arrest and interrogation. An evaluation of this claim requires analysis of exactly the level of police-citizen interaction in the facts before us.

The most intrusive level of interaction between the police and a defendant is that of the full-fledged "custodial interrogation." *Miranda* v. *Arizona* (1966), 384 U.S. 436 [36 O.O.2d 237], provided that, once an individual is taken into custody, he must be given certain warnings before being subjected to police interrogation. It is clear that the defendant in the case before us was questioned by police officers, but for this questioning to be a violation of his rights, he must also show that he was in custody at the time of the questioning. In *Miranda* and later cases, the atmosphere and location of the questioning is critical to its custodial nature. *Miranda* is specifically concerned with a defendant who is "swept from familiar surroundings * * * into police custody."

*Dunaway* v. *New York* (1979), 442 U.S. 200, a case which defendant appears to rely heavily upon, explained the rationale of the protective warnings, holding that:

"* * * [D]etention for custodial interrogation — regardless of its label — intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest. * * *" *Id.* at 216.

The facts of *Dunaway* are very different from those in the case before us, however, and the court in *Dunaway* makes clear that those facts are crucial to its decision. In *Dunaway:*

"* * * Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. * * *" *Id.* at 212.

It is obvious that defendant, who was asked two brief questions in a friend's home, despite being under temporary security restraint during the execution of a search warrant, was undergoing a far less intrusive and time-consuming process of interrogation than those described in *Dunaway* and *Miran-*

da. Indeed, the court in *Miranda* specifically stated that its holding was not intended to hamper the traditional function of police officers in investigating crime. The description in footnote 46, of such traditional and appropriate "on-scene questioning," which is quoted herein, is particularly apt in light of the facts before us:

"The distinction and its significance has been aptly described in the opinion of a Scottish court:

" 'In former times such questioning, if undertaken, would be conducted by police officers visiting the house or place of business of the suspect and there questioning him, probably in the presence of a relation or friend. However convenient the modern practice may be, it must normally create a situation very unfavourable to the suspect.' *Chalmers* v. *H. M. Advocate,* [1954] Sess. Cas. 66, 78 (J.C.)." *Id.* at 478.

The general on-scene questioning is discussed in *Miranda* as a legitimate and necessary part of the fact-finding process undertaken by the police at the scene of the criminal activity. This conduct is another example of the intermediate level of police-citizen interaction, similar to that of the brief "stop and frisk" or "investigative detention" permitted under the doctrine of *Terry, supra. Terry,* which held that the Fourth Amendment was applicable to investigative detentions, described a class of behavior in which a balancing test would be applied between the important interests of the officers, which include personal safety and the control of the drug traffic, and the relatively minimal invasion of privacy of the defendant. *Terry,* as we have stated earlier, held that such a brief stop could be made on less than probable cause, if there were specific and articulable facts leading to the inference that the defendant was engaged in criminal activity which reasonably warranted the intrusion. The brevity of the invasion was of great importance in *Terry,* and *Terry* also stressed the importance of the "concrete factual circumstances of individual cases" in determining the limits of protective searches and seizures. *Id.* at 29.

Under the facts of this case, it is apparent that the officers had the required articulable suspicion of defendant, and that his detention was necessarily brief and the invasion of his privacy was minimal. While the detention, for the hour-long duration of the search, was slightly longer than the stop in *Terry,* the actual questioning occupied only a small portion of that time, and the invasion of privacy was less severe than the body frisk condoned under *Terry.* See, also, *Davis* v. *Mississippi* (1969), 394 U.S. 721, which reiterated the position taken by the court in *Terry* that the detention of a defendant, during the investigative stage, does not require probable cause.

The above cases, and several which follow them, indicate that there is at least one intermediate level of police-citizen interaction, often referred to as "investigative detention" or "on-the-scene questioning," in which the full panoply of protections of the Fourth Amendment are not invoked, and in which *Miranda* warnings need not be given, for no actual arrest has occurred. *Florida* v. *Royer* (1983), 460 U.S. 491, emphasized the importance of tailoring the scope of the detention to what is necessary to fulfill the purpose of the stop, and the case-by-case analysis to be made of the facts in each detention situation. *Florida* v. *Rodriguez* (1984), 469 U.S. ____, 83 L. Ed. 2d 165, and this court's opinion in *State* v. *Hassey* (1983), 9 Ohio App. 3d 231, dealt with temporary detentions of suspected drug traffickers for questioning at airports, based upon reasonably articulable suspicion on the part of the police, and described these as less intrusive stops,

to be reviewed under a lesser standard akin to the balancing test in *Terry*. *Hassey*, in fact, suggests the possibility of yet a third level of police-citizen interaction, designated "mere police-citizen contact" for cases in which, although the defendant is subject to questioning, he is neither restrained nor physically touched.

While the defendant in the case before us was subject to more active police intervention than that involved in potential "police-citizen contact" cases, the police conduct described in the transcript appears to come within the level of conduct which is labeled "investigative detention" and "on-the-scene questioning." Therefore, defendant was not entitled to *Miranda* warnings before the brief questioning made to determine the ownership of one of several coats which were being searched under a valid warrant; neither did his detention amount to an unlawful arrest. The trial court acted within its sound discretion in admitting the statements made by defendant to the officers. The second assignment of error is not well-taken and is overruled.

For the foregoing reasons, the judgment of the trial court is affirmed.

*Judgment affirmed.*

REILLY, P.J., and NORRIS, J., concur.