727 A.2d 938

**Richard Warren STANFORD**

v.

**STATE of Maryland.**

**No. 127, Sept. Term, 1998.**

Court of Appeals of Maryland.

April 16, 1999.

Julia Doyle Bernhardt, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for Petitioner.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

CATHELL, Judge.

Petitioner Richard Warren Stanford was convicted in the Circuit Court for Baltimore County of possessing cocaine. He was sentenced to two years of imprisonment, with one year suspended in favor of eighteen months of probation. The Court of Special Appeals affirmed his conviction and sentence in an unreported opinion. Prior to trial, petitioner moved to suppress as evidence the cocaine he subsequently was convicted of possessing. That motion was denied. On appeal, petitioner challenges that pretrial ruling, arguing that his detention by the police, during which the cocaine was discovered, was unreasonable under the Fourth Amendment of the United States Constitution. We agree and vacate his conviction.

## I. Background

The Baltimore County Police Department obtained on February 7, 1997, a "no-knock" search and seizure warrant for Apartment D in the Hartland Run Apartment Complex near Essex, Maryland. The affidavit supporting the warrant explained that a confidential informant had told the police that two men nicknamed "Poo" and "Tony" were distributing cocaine from Apartment D, which was rented by "Poo." The informant believed a man nicknamed "Shawn" supplied "Poo" and "Tony" with the cocaine and also carried a handgun.

During their preliminary investigation, the police arranged for the informant to purchase cocaine from the men, once from "Poo" and "Tony" together, and on a second occasion from "Poo" alone. The police also learned the lessee of Apartment D was Mr. Tavon Banks and that the Baltimore Gas and Electric Company billing records for the apartment were in Mr. Banks' name. The search warrant authorized the police to search the apartment as well as the persons of Mr. Banks, whom the police believed to be "Poo," and the individuals nicknamed "Tony" and "Shawn." The record reflects the police knew that "Tony" was the street name of Mr. Raoul Jenkins. "Shawn," however, remained unknown to the police during the investigation and no officer claimed to believe petitioner might be "Shawn." The warrant, based on the informant's tip, described "Shawn" as a black male, with a height of five feet, eight inches, and weighing 175 pounds. Petitioner, a black male, is six feet tall and weighs 210 pounds.

At about 8:30 p.m. on February 7, Detective Keith Williams began surveillance of the Hartland Run Apartment Complex in preparation of the execution of the warrant. From his undercover truck, Detective Williams could see the common stairwell of the building and its entranceway, but not the door to Apartment D. Detective Williams observed three black men exit that stairwell. He immediately recognized Mr. Banks, but not the other two individuals, who were Mr. Jenkins and petitioner. The three men got into petitioner's automobile, with petitioner driving, and left. Detective Williams radioed to uniformed officers in the area to stop the three men so they could be brought back to Apartment D during the search.

Uniformed officers stopped the vehicle on Maryland Route 702 about one-fourth of a mile from the apartment complex. Detective Williams drove toward the scene on Route 702, but observed the stop from a distance to protect his cover. As the officers removed the three men from the car, Detective Williams recognized Mr. Jenkins, whom he knew to be "Tony" from the search warrant. Detective Williams still did not recognize petitioner. Upon the uniformed officers' request,

petitioner produced his registration and driver's license. Both documents showed his address, which was not Apartment D. The license listed petitioner's height as six feet and weight as 210 pounds. The uniformed officers checked both documents with the dispatcher for any criminal information, which yielded negative results. All three men were frisked for weapons, handcuffed, and taken in a police car back to Apartment D. Detective Williams testified that petitioner was "detained" with the others because neither he nor the officers could identify petitioner.[1]

Once returned to the apartment, the three men were taken into the kitchen and handcuffed individually to three chairs near the kitchen table. Detective Jeffrey Sewell, the author of the warrant application, sat at the remaining chair at the table and kept an inventory during the search. Detective Frank Massoni, also involved in the investigation, read the three men the search warrant and their *Miranda* rights. Detective Massoni then took the three men into the bathroom one at a time and strip searched them while other officers searched the apartment for contraband. Mr. Banks was searched first, then Mr. Jenkins. Detective Sewell later testified that as Mr. Jenkins was being returned to his chair, petitioner "was moving around in his chair [and] moving his hands behind his back." While petitioner was being strip searched in the bathroom, Detective Sewell found two "baggies" of cocaine on the floor under the table, near where petitioner had been sitting. Other contraband was discovered in the apartment and all three men were arrested.

Prior to his trial, petitioner moved to suppress the cocaine as evidence, arguing that his detention was illegal under the

---

1. The language of the case of *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), relied on by petitioner, was couched in terms of "detention." Petitioner primarily argues in his brief that the seizure or detention, not arrest, was improper. In the context of this case, the result we arrive at would be the same, whether the conduct prior to the formal announcement of an arrest, was a detention or itself an arrest. *Cf. State v. Evans*, 352 Md. 496, 723 A.2d 423 (1999).

Fourth Amendment. The motions judge, however, denied the motion. Petitioner was tried and convicted in a bench trial before another judge. After petitioner's conviction, he appealed to the Court of Special Appeals, arguing that the motions judge erred in denying the motion to suppress. The intermediate appellate court affirmed in an unreported opinion. We granted a writ of certiorari. Petitioner presents the following questions in his brief:

 1. Whether the rule of *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), applies to non-residents and non-occupants of a residence who are not named in a search warrant to search the residence.

 2. Whether the trial court erred in denying the motion to suppress.

## II. *Michigan v. Summers*

 Seizures of the person are judged under a Fourth Amendment standard of reasonableness. *See Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion); *Michigan v. Summers*, 452 U.S. 692, 697, 699–700, 101 S.Ct. 2587, 2591, 2593, 69 L.Ed.2d 340 (1981). Generally, any seizure of a person, whether by arrest or detention, must be supported by probable cause. *Summers*, 452 U.S. at 700, 101 S.Ct. at 2593, 69 L.Ed.2d 340; *Dunaway v. New York*, 442 U.S. 200, 208, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979); *see also Ashton v. Brown*, 339 Md. 70, 120, 660 A.2d 447, 472 (1995) ("[A] police officer has legal justification to make a warrantless arrest where he has probable cause to believe that a felony has been committed, and that the arrestee perpetrated the offense." (citing Md.Code (1957, 1992 Repl.Vol., 1994 Cum.Supp.), Art. 27, § 594B(c))). For Fourth Amendment purposes the Supreme Court has created certain exceptions to the probable cause requirement. For example, police officers may "stop and frisk" an individual if they have a reasonable suspicion that the suspect is engaged in criminal activity and presently armed and dangerous. *Terry v. Ohio*, 392 U.S. 1, 30–31, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968); *see also United States v. Brignoni–Ponce*,

422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975) (holding Border Patrol agents may lawfully stop persons they reasonably suspect of being illegal immigrants and question them about their citizenship); *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) (extending the holding of *Terry* to a stop based on a reliable informant's tip that the defendant might be armed and carrying illegal drugs).

■■■ Another exception relevant to this opinion was created in *Summers,* 452 U.S. at 705, 101 S.Ct. at 2595, 69 L.Ed.2d 340, when the Supreme Court held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." (Footnote omitted.) In *Summers,* the defendant was walking down the front steps of his own single family home just as officers approached to search it pursuant to a warrant. The officers asked Mr. Summers to open the door. Mr. Summers told the police that he had locked his keys inside. He rang the intercom, but the person answering refused to open the door. The police forced open the door. One officer brought Mr. Summers into the house and detained him. Eight other people in the house also were detained. The officers searched the house and discovered illegal drugs in the basement. The officers then arrested Mr. Summers and, upon a search incident to arrest, found an envelope containing heroin in his jacket.

The Supreme Court initially noted that *Dunaway* "reaffirmed the general rule that an official seizure of the person must be supported by probable cause, even if no formal arrest is made." *Summers,* 452 U.S. at 696, 101 S.Ct. at 2591, 69 L.Ed.2d 340. *Dunaway,* however, "recognized that some seizures significantly less intrusive than an arrest have withstood scrutiny under the reasonableness standard embodied in the Fourth Amendment." *Summers,* 452 U.S. at 697, 101 S.Ct. at 2591, 69 L.Ed.2d 340. The Supreme Court cited *Terry, Adams,* and *Brignoni–Ponce* as examples of less intru-

sive seizures. In those cases, the Supreme Court "recognize[d] that some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity." *Summers*, 452 U.S. at 699, 101 S.Ct. at 2592–93, 69 L.Ed.2d 340.

Turning to the circumstances in *Summers*, the Supreme Court first noted that detaining "residents" of a household during a search of their home was a limited intrusion under the Fourth Amendment because the detention was "surely less intrusive than the search itself." *Id.* at 701, 101 S.Ct. at 2593, 69 L.Ed.2d 340. The Supreme Court reasoned that residents of a home being searched, unless they intended to flee, would want to stay in the premises to observe the search for their own protection. In addition, because the detention occurs in their own residence, there would be less public stigma than an investigative detention at the station house.

Next, the Supreme Court examined the heightened law enforcement justifications for a detention during a search. The Court noted three particular interests: (1) preventing flight should contraband be found; (2) "minimizing the risk of harm to the officers"; and (3) gaining the assistance of the "occupants" to facilitate an orderly and quick search, for example, by opening locked doors or containers. *Id.* at 702–03, 101 S.Ct. at 2594, 69 L.Ed.2d 340. The Court also emphasized that because a search warrant had been obtained, the decision of whether sufficient probable cause existed to enter Mr. Summers' home had been made by a neutral, detached magistrate, not the officers in the field. Thus, the Supreme Court concluded that as long as police interests justify a limited detention, "[i]f the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to

search his home." *Id.* at 704–05, 101 S.Ct. at 2595, 69 L.Ed.2d 340.

### III. "Occupants"

The parties in this case debate the meaning *Summers* gives to "occupants" of the place to be searched. *Summers* used the term "occupants" interchangeably with "residents," without defining either term. The briefs submitted to this Court note a split of authority in other jurisdictions as to whether "occupants" applies to persons visiting the searched premises when the police execute a search warrant. A review of the relevant case law reveals three different approaches.

First, some jurisdictions categorically limit *Summers* to actual residents of the place to be searched. *See United States v. Reid,* 997 F.2d 1576, 1579 (D.C.Cir.1993) ("[U]nlike Summers, Reid was *not* a resident of the apartment which was to be searched under the warrant, and the trial did not disclose that he had any proprietary or residential interest in the suspected premises."), *cert. denied,* 510 U.S. 1132, 114 S.Ct. 1105, 127 L.Ed.2d 417 (1994); *State v. Carrasco,* 147 Ariz. 558, 561, 711 P.2d 1231, 1234 (Ariz.Ct.App.1985) (noting that the Supreme Court's reasoning that police could facilitate the search by using a detained suspect to open locked doors and containers logically does not apply to visitors); *State v. Williams,* 665 So.2d 112, 115 (La.Ct.App.1995) (affirming a motion to suppress because the defendant "was not a resident of the house to be searched, nor was she even a known suspect."); *People v. Burbank,* 137 Mich.App. 266, 269, 358 N.W.2d 348, 349 (1984) (per curiam) (distinguishing *Summers* because the defendant "did not live in the house that the police were searching."), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 962, 83 L.Ed.2d 967 (1985); *Lippert v. State,* 664 S.W.2d 712, 720 (Tex.Crim.App.1984) ("[W]e do not agree that *Summers* can be extended to a non-occupant. . . .").

Language in *Summers* appears to support this interpretation. For example, the Supreme Court, justifying the probable cause exception, said:

A neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorized a substantial invasion of the privacy *of the persons who resided there.* The detention of *one of the residents* while the premises were searched, although admittedly a significant restraint on his liberty, was surely less intrusive than the search itself. Indeed, we may safely assume that most citizens ... would elect to remain in order to observe the search of *their possessions.* ... Moreover, because the detention in this case was *in* [*Summers* ]*'s own residence,* it could add only minimally to the public stigma associated with the search....

*Summers,* 452 U.S. at 701–02, 101 S.Ct. at 2593–94, 69 L.Ed.2d 340 (emphasis added) (footnotes omitted). In its holding, the Supreme Court stated that "it is constitutionally reasonable to require [a] citizen to remain while officers of the law execute a valid warrant *to search his home." Id.* at 705, 101 S.Ct. at 2595, 69 L.Ed.2d 340 (emphasis added). Quoting part of this language, Professor Wayne LaFave argues "that the word 'occupants' is not to be loosely construed as covering anyone present, but instead is to be interpreted literally." 2 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 4.9(e), at 650 (3d ed.1996) (footnote omitted).

A second group of jurisdictions also recognize that a visitor generally may not be detained under *Summers;* however, these jurisdictions allow a detention if the police can point to reasonably articulable facts that associate the visitor with the residence or the criminal activity being investigated in the search warrant. To ascertain whether such an association exists, these cases recognize that police must make a minimal intrusion to ascertain the visitor's identity. *See Baker v. Monroe Township,* 50 F.3d 1186, 1192 (3d Cir.1995) ("Although *Summers* itself only pertains to a resident of the house under warrant, it follows that the police may stop people coming to or going from the house if police need to ascertain whether they live there."); *United States v. McEaddy,* 780 F.Supp. 464, 471 (E.D.Mich.1991) (holding that " 'occupant' refers to any individual on the premises who, from the per-

spective of the executing officers at the scene, might reasonably have some relationship to the subject premises."), *aff'd sub nom. United States v. Fountain,* 2 F.3d 656 (6th Cir.), *cert. denied,* 510 U.S. 1014, 114 S.Ct. 608, 126 L.Ed.2d 573 (1993); *People v. Glaser,* 11 Cal.4th 354, 365, 45 Cal.Rptr.2d 425, 902 P.2d 729, 734 (1995) (holding that the detention of the defendant, who drove up to his own house prior to search, "was justified by the need to determine what connection defendant, who appeared to be more than a stranger or casual visitor, had to the premises, and by the related need to ensure officer safety and security at the site."); *Claffey v. State,* 209 Ga.App. 455, 456, 433 S.E.2d 441, 442 (upholding the detention of a motorist and passengers for the purpose of ascertaining whether they lived in the premises being searched), *aff'd,* 211 Ga.App. 375, 439 S.E.2d 106 (1993); *State v. Graves,* 119 N.M. 89, 92, 888 P.2d 971, 974 (N.M.Ct.App.1994) (holding that "the police cannot detain a non-resident unless they have a reasonable basis to believe that the non-resident has some type of connection to the premises or to criminal activity."); *State v. Schultz,* 23 Ohio App.3d 130, 133, 491 N.E.2d 735, 739 (1985) (extending the definition of "occupants" to persons with a "reasonable connection" to the property); *State v. Curtis,* 964 S.W.2d 604, 612–14 (Tenn.Crim.App.1997) (noting that police may detain but not search a "transient visitor" when reasonable suspicion exists that he or she might be connected to the illegal activity conducted in the residence); *State v. Broadnax,* 98 Wash.2d 289, 295, 654 P.2d 96, 103 (1982) (en banc) (requiring, to detain a visitor, facts additional to the visitor's "mere presence" at the scene that associate him or her with the illegal activities to be investigated); *cf.* 2 LaFave, § 4.9(e), at 651 ("The police still must make the judgment as to who is an occupant rather than a visitor, and surely they are entitled to act upon appearances without regard to what the true facts ultimately turn out to be.").

Finally, some jurisdictions broadly define "occupants" to include those visiting the residence to be searched. Most of these cases, however, review the detention of the visitor under the balancing of interests conducted in *Summers* by compar-

ing the nature of the police intrusion with any valid law enforcement interests in the detention. *See. Fountain*, 2 F.3d at 663 (explaining that the detention of a nonresident is reasonable if the detention satisfies the factors described in *Summers*); *United States v. Pace*, 898 F.2d 1218, 1239 (7th Cir.) ("At the very least, *Summers'* analysis—balancing the nature of the intrusion against the governmental interests justifying it—applies" to the detention of visitors), *cert. denied*, 497 U.S. 1030, 110 S.Ct. 3286, 111 L.Ed.2d 795 (1990); *United States v. Taylor*, 716 F.2d 701, 707 (9th Cir.1983) ("The Court clearly framed *Summers* in terms of 'occupants', not owners"; however, detention of the defendant, a visitor, was not justified by any of the law enforcement interests described in *Summers*); *State v. Phipps*, 528 N.W.2d 665, 668 (Iowa Ct.App.1995) (holding that *Summers* applies to nonresident visitors); *cf. United States v. Vaughan*, 718 F.2d 332, 335 (9th Cir.1983) (holding that police could detain but not search a passenger in a car for safety reasons while the other occupants were searched legally).

## IV. Resolution

We decline at this time to adopt one of these three approaches because petitioner's detention was unreasonable under all of them. Under the approach that limits *Summers* to residents, the detectives' investigation into who rented the apartment and their surveillance of the apartment prior to the search never indicated that petitioner was a resident of the apartment. Even under the line of cases that extend the term "occupants" to those visiting the apartment, *Summers* still would not apply. The record lacks any evidence that petitioner ever set foot inside Apartment D before he was detained. Detective Williams saw petitioner come out of the apartment building with Mr. Banks and Mr. Jenkins, but not out of Mr. Banks' apartment itself. The State produced no evidence that petitioner was ever a resident of or even a visitor to Apartment D, no matter how the term "occupant" is construed.

Moreover, under this approach, whether petitioner was a resident of or a visitor to the apartment, the actions of the

officers in this case failed to satisfy the balancing of interests required by the Supreme Court in *Summers,* 452 U.S. at 701–03, 101 S.Ct. at 2593–94, 69 L.Ed.2d 340. We note that the police intrusion upon petitioner was significantly greater than in *Summers.* Mr. Summers was detained on the front steps of his own home and taken inside while the search was conducted. *Id.* at 693 & n. 1, 101 S.Ct. at 2589 & n. 1, 69 L.Ed.2d 340. Petitioner, by contrast, was stopped and frisked on the side of a public highway at least one-fourth of a mile from the search site, handcuffed, placed in a police cruiser, transported back to another person's apartment, was being detained there for the purpose of a strip search when, under the State's theory, he discarded the drugs. In addition, the law enforcement interests enunciated in *Summers* were lacking in this case. Petitioner, not being a resident of Apartment D, could not assist the officers in facilitating the search. Because the three men had left the area to be searched, were frisked during the traffic stop, and the two known suspects named in the warrant were detained by the police,[2] it is not likely that they or petitioner posed a risk of unlawful flight or any danger to the officers. Furthermore, there was no evidence at the motions hearing that petitioner had any knowledge that the search warrant was about to be executed for Apartment D.

In *United States v. Sherrill,* 27 F.3d 344, 345 (8th Cir.), *cert. denied,* 513 U.S. 1048, 115 S.Ct. 647, 130 L.Ed.2d 552 (1994), the United States Court of Appeals for the Eighth Circuit examined facts similar to those in this case. The police, about to execute a warrant, witnessed the defendant leave his home, get in his car, and drive away. Officers stopped him one block from his home. The officers told the defendant they had a search warrant for his residence and would detain him during the search. The appellate court held that *Summers* did not apply. *Id.* at 346. In doing so, the court reasoned that

---

**2.** The officers did not search the car during the stop. Instead, Detective Williams drove it back to the apartment and searched it, but found no contraband.

because Sherrill had already exited the premises, the intrusiveness of the officers' stop and detention on the street was much greater [than in *Summers*]. In addition, ... the officers had no interest in preventing flight or minimizing the search's risk because Sherrill had left the area of the search and was unaware of the warrant.

*Id.* (citation omitted). In reaching that conclusion, the court cited its opinion in *United States v. Hogan,* 25 F.3d 690, 693 (8th Cir.1994), in which it held that *Summers* did not apply when a defendant was stopped over three miles from his home, handcuffed, returned to his house and detained. The *Hogan* court similarly found that the intrusion caused by the detention was "much greater than in *Summers.*" *Id.* As in *Sherrill,* the *Hogan* court reasoned that

[N]one of the law enforcement interests set forth in *Summers* apply. Hogan was not aware that a search was about to be conducted and therefore did not pose a risk of flight. There was no risk of harm to the agents from Hogan in a car miles away from the premises.

*Id.; see also United States v. Boyd,* 696 F.2d 63, 65 n. 2 (8th Cir.1982) ("The [*Summers* ] Court certainly did not sanction the search and seizure of residents who, at the time of the search, are several blocks from their home."), *cert. denied,* 460 U.S. 1093, 103 S.Ct. 1794, 76 L.Ed.2d 360 (1983).

*United States v. Edwards,* 103 F.3d 90 (10th Cir. 1996), provides another example of the application of *Summers* to a case like the one before this Court. The police in *Edwards* obtained a search warrant for a suspected "drug house," 1001 Revere Street, which Mr. Edwards frequented. As police were about to conduct the search, they witnessed Mr. Edwards leave the house, get into his car, and drive away. They stopped and frisked Mr. Edwards and then detained him on the side of the street in handcuffs and at gunpoint for forty-five minutes while the house was searched. The Court of Appeals for the Tenth Circuit, applying *Summers,* held the detention was unlawful:

Here, the police's legitimate law enforcement interest in preventing flight in the event that incriminating evidence was found was far more attenuated than in *Summers*. Unlike the defendant in *Summers*, who was present where the search warrant was executed, Edwards did not know—prior to being stopped—that any warrant *was* being executed. He thus had no reason to flee. The police knew the address of Edwards's Denver residence, and had no reason to believe that he would not return to it, or to 1001 Revere Street. Further, after completing the *Terry* stop, the police could have "tailed" Edwards had they then let him go.

Neither of the latter two *Summers* interests were served in any way by Edwards's extended detention. First, the police quickly determined that Edwards posed no risk of harm to them. Second, and in contrast to the defendant in *Summers*, Edwards's streetside detention played no part in facilitating the orderly completion of a search being conducted three blocks away.... [H]is detention served no "facilitating" purpose.

*Id.* at 93–94 (footnote omitted).[3]

██ Examining the facts under the approach of jurisdictions that allow the police to detain visitors long enough to

---

**3.** We realize the Supreme Court in *Summers,* 452 U.S. at 702 n. 16, 101 S.Ct. at 2594 n. 16, 69 L.Ed.2d 340, did not "view the fact that [Summers] was leaving his house when the officers arrived to be of constitutional significance" because his seizure in front of the house "was no more intrusive than the detention of those" inside the house being searched. The Court of Special Appeals in *Fromm v. State,* 96 Md.App. 249, 256, 624 A.2d 1296, 1299 (1993), upheld, under *Summers,* the detention of a suspect who exited a neighboring apartment building when his residence was about to be searched. Our decision today does not overturn *Fromm* because an off-premises detention of a person named in a warrant can be reasonable under the Fourth Amendment if it satisfies the balancing of interests in *Summers. See, e.g., United States v. Cochran,* 939 F.2d 337, 339 (6th Cir.1991) (*"Summers* does not impose upon police a duty based on geographic proximity (i.e., defendant must be detained while still on his premises); rather, the focus is upon police performance...."), 502 U.S. 1093, 112 S.Ct. 1166, 117 L.Ed.2d 413 (1992); *State v. Thomas,* 603 So.2d 1382, 1383–84 (Fla. Dist.Ct.App.1992) (holding the detention of a suspect who approached the house being searched was proper under *Summers* because his

ascertain their identity and address, the officers in this case had such an opportunity during the stop on Route 702 and did learn petitioner's identity and address from his driver's license and registration. Nevertheless, they continued to detain petitioner, claiming they were unaware whether he was associated with the apartment. The evidence obtained prior to the search, upon which the affidavit supporting the warrant was based, however, indicated that the only persons specifically associated with the apartment were Mr. Banks, Mr. Jenkins, and "Shawn." Petitioner's license clearly revealed to the officers at the highway stop that petitioner did not match the description of "Shawn." Once the police discovered this, petitioner's detention should have ended. The Supreme Court, in *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325–26, 75 L.Ed.2d 229, said with regard to the scope of a detention based on less than probable cause:

The scope of the detention must be carefully tailored to its underlying justification.

... [A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

On this point, the Supreme Court has further stated:

Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop.... [W]e have emphasized the need to consider the law enforcement purposes to be served by the stop as well

---

actions created a risk of harm and potential for flight from the scene); *State v. Ailport*, 413 N.W.2d 140, 144 (Minn.Ct.App.1987) (holding that a suspect's pre-search detention was reasonable because he had a violent criminal record). Here, petitioner's detention was overly intrusive and lacked any reasonable police justification. *See supra*. Moreover, police may not detain a nonoccupant who is unnamed in the warrant and stopped at a distance from the premises under the warrant's aegis and then return him to the premises in order to make him an occupant, resident, or visitor so they may search him or her pursuant to *Summers*.

as the time reasonably needed to effectuate those purposes. Much as a "bright line" rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.

*United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985) (citations omitted). The Supreme Court in *Sharpe* added that in assessing the reasonableness of a detention, "it [is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* at 686, 105 S.Ct. at 1575, 84 L.Ed.2d 605. The detention by the officers in this case went well beyond the time necessary to confirm any suspicions they may have had about petitioner. Likewise, the actions of the police—publicly stopping and frisking petitioner, handcuffing him, transporting him in a police car to someone else's apartment, and strip searching him—were not the "least intrusive means reasonably available to verify or dispel the officer[s'] suspicion in a short period of time." *Royer,* 460 U.S. at 500, 103 S.Ct. at 1325–26, 75 L.Ed.2d 229.

## V. Conclusion

The detention of petitioner was unreasonable under the Fourth Amendment. The police had no probable cause to detain petitioner; nor could they detain him under the holding of *Michigan v. Summers.* Petitioner was not a resident of Apartment D and no conclusive evidence existed that he had ever been inside the apartment. Further, the intrusiveness of the police detention in this case far exceeded the scope and time allowed under Fourth Amendment jurisprudence and lacked sufficient legitimate police interests that could justify such a detention. Petitioner's conviction, therefore, must be vacated.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY**

AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR A NEW TRIAL; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY BALTIMORE COUNTY.