*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0266P (6th Cir.)
File Name: 00a0266p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
 *Plaintiff-Appellant,*

*v.*

No. 99-5565

JAMES M. BOHANNON,
 *Defendant-Appellee.*

Appeal from the United States District Court
for the Middle District of Tennessee at Cookeville.
No. 98-00012—Thomas A. Wiseman, Jr., District Judge.

Submitted: April 28, 2000

Decided and Filed: August 9, 2000

Before: KENNEDY, SILER, and BATCHELDER, Circuit
Judges.

_____

**COUNSEL**

**ON BRIEF:** Robert Anderson, ASSISTANT UNITED
STATES ATTORNEY, Nashville, Tennessee, for Appellant.
Bob Lynch, Jr., Nashville, Tennessee, for Appellee.

 SILER, J., delivered the opinion of the court, in which
KENNEDY, J., joined. BATCHELDER, J. (pp. 6-10),
delivered a separate dissenting opinion.

---

**OPINION**

---

SILER, Circuit Judge.   The United States of America, plaintiff, appeals an order granting a motion to suppress evidence seized from James Bohannon, defendant, during a warrantless search.   For the reasons discussed below, we REVERSE.

**BACKGROUND**

In November 1997, law enforcement agents executed a search warrant for a trailer residence suspected of being used as a methamphetamine laboratory.   Two of the agents, Mike Thompson and Sam Lee, left the residence.   It was late evening and dark outside at the time.   Several agents were still inside completing the administrative portion of the search.

As Lee and Thompson were walking to their car, another car drove up the driveway at a rapid rate of speed and stopped near the front porch of the residence.   James Bohannon got out of the passenger's side of the car and Johnny Bohannon got out of the driver's side.   They walked quickly toward the residence.   Lee told them to stop, approached Johnny, and asked for some identification.   He produced a state-issued identification card which was not a driver's license.

James Bohannon was holding a beer in his left hand and had his right hand in his pocket when he got out of the car. Thompson asked him to set the beer down and take his hand out of his pocket and James complied.   But James put his hand back in his pocket twice and acted very nervous. Finally, Thompson instructed James to raise his hands. When Thompson proceeded to frisk him, James dropped his hands. Thompson slapped James's hands back and continued the frisk.   He saw a bulge in James's pocket and he pulled out two packs of cigarettes and some methamphetamine.   He asked James if he had any more drugs and James told him he

wrong time.  Surely, this type of police conduct is precisely the type of state action the Fourth Amendment was designed to protect against.  Therefore, because I believe the majority has improperly extended the holdings of *Summers* and *Fountain* under the facts presented by this case, I respectfully dissent.

had some more in his back pocket as well as a gun.  Thompson found a loaded handgun and an extra clip in James's waistband.

After his arrest, James confessed to operating a methamphetamine laboratory.  He consented to a search of his residence where agents found equipment, chemicals, and paraphernalia which could be used to manufacture methamphetamine.

## DISCUSSION

Law enforcement officials have a limited authority to detain occupants of a premises while a proper search is being conducted.  *See Michigan v. Summers,* 452 U.S. 692, 705 (1981).  In *Summers*, the Court stated that:

> Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found.  Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers.  Finally, the orderly completion of the search may be facilitated if the occupants of the premises are present.

*Id.* at 702-703.

In the present case, James was not a resident of the premises being searched.  However, agents' authority to detain citizens has been extended.  In *United States v. Fountain,* 2 F.3d 656 (6th Cir. 1993), this court held that detention of the defendant, who did not live at the residence that was being searched, was constitutional because two of the justifications for detaining residents still existed.  The court stated that the search was necessary for the safety of the agents and "reasonable and proportional to law enforcement's legitimate interests in preventing flight in the event incriminating evidence is found."  *Id.* at 663.  The court declared that those concerns are the same whether or not the person detained is a resident of the premises being searched.  *Id.*  Therefore, it is irrelevant that James was not a resident.

The present case is also different from *Summers* in that James was not inside the residence. However, this fact does not make the search of James unconstitutional. As the Third Circuit concluded, "[a]lthough *Summers* itself only pertains to a resident of the house under search, it follows that the police may stop people coming to or going from the house if police need to ascertain whether they live there." *Baker v. Monroe Township,* 50 F.3d 1186, 1192 (3d Cir. 1995). The policy justifications of *Summers* and *Fountain,* especially to protect officers' safety, are applicable in this case. "The possible danger presented by an individual approaching and entering a structure housing a drug operation is obvious. In fact, it would have been foolhardy for an objectively reasonable officer not to conduct a security frisk under the circumstances." *United States v. Patterson*, 885 F.2d 483, 485 (8th Cir. 1989). Furthermore, because James showed every intention of walking into the house where armed officers were in the process of completing the search, his safety was also at risk. Preventing his unexpected entry into the trailer was for the safety of everyone involved.

In *United States v. Barrett*, 890 F.2d 855, 857 (6th Cir. 1989), an agent had just completed an authorized search of a residence when he noticed an automobile coming up the driveway. The agent knew couriers made deliveries of drugs to the residence. This court held that the agent was justified in asking Barrett for identification and his purpose for being on the premises. *Id.* at 860. The present case is similar to *Barrett.* The residence searched was a suspected methamphetamine lab. Therefore, an officer could reasonably infer that a customer or distributor would arrive on the premises. The agents had reasonable suspicion that James was involved in criminal activity. Consequently, his detention was constitutional.

If the detention of Bohannon was constitutional, the question becomes whether the frisk of James was authorized under the Fourth Amendment. A law enforcement agent may conduct a pat-down search to find weapons "where he has reason to believe that he is dealing with an armed and

The police have limited authority to stop individuals suspected of wrongdoing, but only if the officer has an articulable suspicion that criminal activity is afoot or that the individual is armed and dangerous. *See Terry*, 392 U.S. at 27; *Ybarra v. Illinois*, 444 U.S. 85, 92-3 (1979). In this case, the district court, after hearing the testimony of both Officers Lee and Thompson, held that "[t]he *Terry* stop was made without any articulated or articulable [] suspicion, other than the mere fact that these people stopped in the middle of five or six cars and a bunch of police officers." The record fully supports this conclusion, and I cannot see any basis upon which to reject the lower court's finding that the police did not have an articulable suspicion.

I believe that Officer Thompson had every right to ask James for identification and inquire into his purpose for coming to the scene. Such exchanges, entered into with the person's consent, do not even present a Fourth Amendment question. In this case, however, Officer Thompson did not make such an inquiry, as Officer Lee did of Johnny Bohannon, but rather chose to detain James based upon nothing more than James' presence at a crime scene. It is well settled that mere proximity to criminal activity is not an adequate basis for the police to make such an investigatory stop. *See Ybarra,* 444 U.S. at 91; *see also U.S. v. Bell*, 762 F.2d 495, 499 (6th Cir. 1985) ("[W]e do not believe that the *Terry* requirement of reasonable suspicion under the circumstances, has been eroded to the point that an individual may be frisked based upon nothing more than an unfortunate choice of associates.") (internal citations omitted). Therefore, I would hold that Officer Thompson's immediate detention of James, based upon nothing more than James' mere presence at a location where police were investigating drug activity, violated James' right to be free from unreasonable seizures under the Fourth Amendment.

By affirming the reasonableness of Officer Thompson's detention of James, the majority opinion creates the opportunity for the police to stop and detain based upon nothing more than a person's being in the wrong place at the

in taking some action to detain the Bakers until the area could be secured.

The facts of this case, however, are entirely different. Here, the police search of the methamphetamine lab had been completed, the police had complete control of the situation, many of the officers had already left the scene, and all that remained was the final paperwork. There is no question that the police had every right to ask the Bohannons to identify themselves and explain their presence on the property. In fact, it would have been irresponsible for them not to inquire. But, because the search was all but complete when the Bohannons arrived, there were no circumstances such as those presented in *Baker*, that might have justified a brief detention until order could be achieved.

In my mind, the district court was correct in holding that the only question presented by this case is whether the police detention of James can be justified as a *Terry* stop. Like the district court, I believe that it cannot. When Officer Thompson ordered James to put down his beer and take his hand out of his pocket, the officer was at that moment subjecting James to an investigatory stop. *See U.S. v. Mendenhall,* 446 U.S. 544, 554 (1980) ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."); *U.S. v. Thompson*, 106 F.3d 794, 798 (7th Cir. 1997) ("'[T]he law is well established that if the officer asks rather than commands, the person accosted is not seized . . .'".); *U.S. v. Steele*, 782 F. Supp. 1301, 1309 (S.D. Ind. 1992), *aff'd*, 989 F.2d 502 (7th Cir. 1993) ("A police officer's verbal command – if heeded – is often sufficient to seize a person."); *see also U.S. v. Winfrey*, 915 F.2d 212, 214, 216 (6th Cir. 1990). In my view, a reasonable person standing in James' position would not have felt free to leave, and, therefore, Officer Thompson's actions must pass constitutional muster.

dangerous individual." *Terry v. Ohio* 392 U.S. 1,27 (1968). The "issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.*

James was riding in a car that drove up to a residence during a nighttime search that was being conducted because the residence was suspected of being a laboratory for an illegal drug operation. The rapid approach of the vehicle down the long driveway and James's quick exit from the car and approach toward the front door of the trailer indicate an apparent familiarity with the residence. Given that the trailer was owned by a methamphetamine dealer, James's apparent familiarity with the place might give the officers cause for concern that he was there to do business and may have been armed. Furthermore, the driver of the car did not provide the law enforcement agents with a driver's license, but merely a state-issued identification card. James acted very nervous and twice ignored the officer's request that he keep his hands out of his pockets. A reasonable conclusion for an officer to make was that James may have been armed and dangerous. Therefore, it was reasonable and prudent for the agent "to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Id.* at 30.

The policy justifications of *Summers* and *Fountain,* especially to protect officers' safety, are applicable in this case. Therefore, the agents had the constitutional authority to briefly detain and search James Bohannon. As a consequence, the fruits of the search and James's inculpatory statement concerning his residence should not be suppressed.

REVERSED.

---

**DISSENT**

---

ALICE M. BATCHELDER, Circuit Judge, dissenting. In granting the defendant's motion to suppress, the district court held *Michigan v. Summers,* 452 U.S. 692 (1981) and *U.S. v. Fountain*, 2 F.3d 656 (6th Cir. 1993) were inapplicable to the question of whether the police were justified in detaining and subsequently frisking James Bohannon. Rather, the district court believed the reasonableness of the officer's conduct was properly judged by the standards set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). I agree.

The Supreme Court decision in *Summers* held that the police have the authority to detain occupants of a premises while a proper search is being conducted. *See Summers*, 452 U.S. at 705. We extended the holding in *Summers* to allow officers to detain all persons who are present at the site when the search warrant is being executed, regardless of whether they be occupants of the premises or merely visitors. *See Fountain*, 2 F.3d at 663-4. Read together, *Summers* and *Fountain* allow the authorities to detain all persons *who are on the premises to be searched when the police execute a search warrant*. As the Supreme Court explained in *Summers*, the intrusion upon the personal liberty of those found on the premises at the time the police seek to execute a search warrant is justified by legitimate government interests. *See Summers*, 452 U.S. at 702-3 (noting various law enforcement interests, e.g., preventing flight in the event incriminating evidence is found, minimizing the risk of harm to the officers by allowing officers to exercise unquestioned command of the situation, and facilitating the orderly completion of the search).

However, those state interests are not present when, as in this case, those coming to the scene were not on the premises when the police executed the search warrant, but rather arrived after the search had been substantially completed. In this case, there was no concern that the Bohannons would

remove contraband from the premises, because the search was over. Similarly, the police knew the Bohannons were not the owners of the trailer; thus, the police weren't concerned that the men would flee. And, while the safety of the officers is always of paramount concern, the Bohannons' arrival, without evidence of something more, posed no more of a threat than any other passerby who might have wandered into the area surrounding the trailer. Therefore, I disagree with the majority's assertion that the policy justifications of *Summers* and *Fountain* apply to this case.

Moreover, I believe the majority's reliance on the Third Circuit's decision in *Baker v. Monroe Township*, 50 F.3d 1186 (3d. Cir. 1995) is misplaced. In that case, the Baker family brought a §1983 action against Munroe Township and one of its officers alleging their Fourth Amendment rights had been violated. While paying a visit to Mrs. Baker's son, the Baker had family arrived at the son's home just as the police were initiating a drug raid. While most of the officers began to execute the "no knock" warrant on the son's house, some officers ordered the Baker family to "get down," forced them to the ground, pointed guns at them, handcuffed them, searched one of the Baker children, and emptied Mrs. Baker's purse on the ground. After approximately 25 minutes, the visitors were released.

In *Baker,* the Third Circuit justified the detention of the Baker family by extending *Summers* to apply to people coming to or going from the house if the police need to ascertain whether those people live there. *See id.* at 1192. But the *Baker* case is factually distinguishable from this case. In *Baker*, the Baker family arrived as the drug raid was commencing. As police officers raced to the building, the situation had serious potential to erupt into violence. The Third Circuit concluded that under those circumstances, the officers were justified, both for the Baker's protection and their own, to sequester the Bakers until they could be identified. While the Court found that the amount of force used was excessive, it concluded that the police were justified