*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2002 FED App. 0398P (6th Cir.)
File Name:  02a0398p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

CHARLES E. BURCHETT;
CARLA BURCHETT,
        *Plaintiffs-Appellants,*

        *v.*

GREG KIEFER; R. K. COPAS;
TONY ROBINSON; OHIO
BUREAU OF CRIMINAL
INVESTIGATION; PAUL BLISS;
JON DOZER; DENNIS LOWE;
WILLIAM MORRIS,
        *Defendants-Appellees.*

No. 01-3301

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 98-01277—Edmund A. Sargus, Jr., District Judge.

Submitted:  August 6, 2002

Decided and Filed:  November 19, 2002

Before:  MOORE and GILMAN, Circuit Judges; ROSEN,
District Judge.*

_____

    *The Honorable Gerald E. Rosen, United States District Judge for the
Eastern District of Michigan.

1

_____

**COUNSEL**

**ON BRIEF:** David L. Day, Samuel A. Gradwohl, Columbus, Ohio, for Appellants. Randall Lee Lambert, Patricia S. Sanders, LAMBERT, McWHORTER & BOWLING, Ironton, Ohio, Karen J. Huey, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellees.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge. Plaintiffs Charles and Carla Burchett appeal from an order granting the defendants' motion for summary judgment. Plaintiffs brought this action under 42 U.S.C. § 1983 against certain members of the Jackson County Sheriff's Department and of the Ohio Bureau of Criminal Identification and Investigation, alleging violations of their Fourth, Sixth, and Fourteenth Amendment rights. The alleged violations arose out of an incident on July 9, 1998, when Charles Burchett was seized, handcuffed, and detained in a police car while law enforcement officials executed a search warrant on the home of his brother, who lived next door. The district court granted all defendants' motions for summary judgment, concluding that no reasonable jury could find the defendants to have violated the Burchetts' rights. We **AFFIRM** in part and **REVERSE** in part.

**I. BACKGROUND**

Taken in the light most favorable to the plaintiff, the facts of this case are as follows. On July 9, 1998, members of the Ohio Bureau of Criminal Identification and Investigation ("BCI") were asked to assist the Jackson County Sheriff's Department in executing a search warrant on a house in Oak Hill, Ohio, that belonged to Charles Burchett's brother. That evening, Sheriff Kiefer led members of the two teams to the

expand on this claim, presumably he is suggesting that officers violated his Sixth Amendment rights by refusing to identify any specific charges against him during his three-hour detention. However, the facts that Burchett alleges do not amount to a constitutional violation, as the Sixth Amendment applies only to "criminal prosecutions," and no such prosecution had begun. U.S. Const. amend. VI. *See also Jones v. City of Jackson*, 203 F.3d 875, 880 (5th Cir. 2000) ("A defendant's right to be informed of the nature and cause of an accusation brought against him does not exist until the Government is committed to a prosecution."); *Kladis v. Brezek*, 823 F.2d 1014, 1018 (7th Cir. 1987) ("[T]he Sixth Amendment's protection does not come into play until the government has committed itself to prosecution."). As no Sixth Amendment violation occurred, summary judgment was appropriate with respect to this claim.

**III. CONCLUSION**

We therefore **AFFIRM** the grant of summary judgment with respect to all Sixth Amendment claims and with respect to the Fourth Amendment claims against Copas, Dozer, Lowe, Robinson, and Morris. We **REVERSE** the grant of summary judgment with respect to the Fourth Amendment claims against Kiefer and Bliss, and we **REMAND** the case to the district court for further proceedings consistent with this opinion.

observed Burchett being taken into custody, and he observed Burchett in the cruiser several times over a period of hours. Bliss saw that the windows on the cruiser were up. Bliss testified that it was "extremely hot" that day, J.A. at 57 (Bliss Dep.) and that the heat had forced him to abandon his search of the attic several times. Given the heat and Bliss's awareness of the conditions and length of Burchett's detention, there are genuine issues of material fact with respect to Bliss's liability. Similarly, Sheriff Greg Kiefer was present when the officers detained Burchett in the cruiser and when Burchett was released, and Kiefer stated that he saw Burchett in the cruiser several times during the detention. Accordingly, Kiefer knew the length of Burchett's detention in the car, and a reasonable officer in Kiefer's place would have recognized the danger and the violation.

The evidence does not show that any of the other defendants were aware or should have been aware of those facts. Deputy Sheriff R. H. Copas's car was used for the detention, but there is no evidence that he was aware of that fact, let alone aware of the conditions of Burchett's detention. BCI Agent Jon Dozer knew of the heat, as he was in the attic with Agent Bliss, but there is no evidence in the record that he knew of Burchett's detention. BCI Agent Dennis Lowe testified that he saw Burchett in the cruiser, but there is no evidence that he knew of the length of the detention, a key aspect of the detention's dangerousness. We do not find the evidence sufficient to impose liability on Copas, Dozer, or Lowe. There is no evidence in the record linking Deputy Sheriff Tony Robinson or BCI Agent William Morris to Burchett's detention. We thus reverse the grant of summary judgment with respect to Kiefer and Bliss, and we affirm the grant of summary judgment with respect to Copas, Dozer, Lowe, Robinson, and Morris.

## B. The Sixth Amendment Claims

Burchett also alleges that the officers' actions violated his Sixth Amendment right to be informed of the nature and cause of the charges against him. Although Burchett does not

house to search for drugs. Charles Burchett, who lived next door, saw unmarked vehicles pull into his brother's driveway, and he walked to the edge of the property line between the two houses for a better view. The parties agree that the property line is approximately twenty-five feet from each house, and that the two houses are thus approximately fifty feet apart. Burchett saw three individuals, all of whom he describes as wearing black clothes with no identification and two of whom he describes as wearing masks, walk around the back of his brother's house with weapons. According to Burchett, one of the individuals — all of whom turned out to be BCI agents — yelled at him to get on the ground.

Fearing for the safety of his baby, who was in a porch swing nearby, Burchett turned and ran onto his porch. The officers pursued him, because, in BCI Agent Lowe's words, "as I saw him standing there in the yard he had something in his hand and I could see it was something black and looked like it was a weapon at the time. . . . So he turned and ran, he was leaving [the brother's] property and wasn't obeying my command to get on the ground. So I gave chase because I felt he was a threat." Joint Appendix ("J.A.") at 101 (Lowe Dep.). According to Burchett and his wife, Carla, the officers followed him onto the porch and seized him just as he was reaching for his baby. Carla then came outside onto the porch and took the baby from the swing. At this point, Burchett had nothing in his hands; the black object that looked like a weapon turned out to have been Burchett's sunglasses, which were now lying on the porch.

Other officers arrived, and the officials immediately attempted to handcuff Burchett. Burchett admits to having "[t]wisted and turned some" while being handcuffed, J.A. at 88 (Burchett Dep.), and his wife stated that he was "kind of jumping around," J.A. at 61 (Carla Burchett Dep.). BCI Agent Bliss claims that Burchett kept one arm out and would not let the officers bring it down. The officers eventually succeeded in handcuffing him, and according to Burchett, they began pushing him in the direction of the patrol car and off the porch, which has a "step down," and Burchett fell.

J.A. at 78 (Burchett Dep.). He was then taken away and, by his account, "pushed very roughly" into a marked Sheriff's Department patrol car that had arrived after the unmarked cars. J.A. at 78.

Burchett was kept handcuffed and in the police car for three hours while the search was executed. By all accounts, this was a very hot day. Although the incident began sometime after 4:30 in the afternoon, Burchett testified that the outdoor temperature remained at ninety degrees. The car's windows were initially down and the car was running, but upon placing Burchett in the car, the officers rolled up the windows and turned off the car.[1] The air conditioner remained off and the windows up for the three hours. Burchett says that he asked the officers "to roll the window down to get some air," but they told him, "No, shut your mouth." J.A. at 85 (Burchett Dep.). At least two of the officers were aware of the heat that day, as BCI Agent Bliss testified that while he and BCI Agent Dozer were executing the search warrant in the attic of the brother's residence, the temperatures became "extremely hot"[2] and they had to step outside periodically to get some air. J.A. at 57 (Bliss Dep.). Burchett's wife testified that when he was eventually let out of the car, he was "sopping wet from sweat." J.A. at 64 (Carla Burchett Dep.).

Sheriff Kiefer, who observed Burchett in the car, described Burchett as being "generally in a rage." J.A. at 95 (Kiefer Dep.). BCI Agent Bliss testified that he saw Burchett three or

---

[1] BCI Agent Bliss testified that the windows were rolled up only after Burchett began spitting at passers-by. However, for purposes of summary judgment, we accept Burchett's claim that the windows were rolled up immediately and that he did not spit on passers-by.

[2] Burchett stated during his deposition that while he was in the car, Officer Michael Music of the City of Jackson Police Department said, "I hope you burn up in that God damn car." J.A. at 89 (Burchett Dep.). Music is also alleged to have bounced the car up and down by jumping on or grabbing the fender. Burchett apparently stipulated to the dismissal of Officer Music from the present lawsuit, and his conduct is not at issue on appeal.

We also conclude that, under the Supreme Court's recent guidance in *Hope v. Pelzer*, this right was clearly established for qualified immunity purposes. In *Hope*, the Court made clear that a right can be clearly established even if there is no case involving "fundamentally similar" or "materially similar" facts. *See* 122 S. Ct. at 2516. Rather, a right is clearly established when "[t]he reasoning, though not the holding," of a prior court of appeals decision puts law enforcement officials on notice, or when the "premise" of one case "has clear applicability" to a subsequent set of facts. *See id.* at 2517. Here, this standard is met. We have long recognized, for instance, that the Fourth Amendment permits detention using only "the least intrusive means reasonably available." *United States v. Sanders*, 719 F.2d 882, 887 (6th Cir. 1983) (quotation omitted). Similarly, we have recognized that "claims of excessive force do not necessarily require allegations of assault," but rather can consist of the physical structure and conditions of the place of detention. *Cornwell v. Dahlberg*, 963 F.2d 912, 915 (6th Cir. 1992) (rejecting Fourth Amendment excessive force claim on the grounds that a convicted prisoner could bring only an Eighth Amendment excessive force claim, but recognizing that "detention on the cold, muddy ground" could constitute claim of excessive force). These premises have clear applicability to this case, and the reasoning of those cases should have alerted reasonable officers to the constitutional violations inherent in subjecting a detainee to excessive heat. *See also Hope*, 122 S. Ct. at 2514-15 (holding that handcuffing inmate to hitching post, and thus causing "unnecessary exposure to the heat of the sun," violated clearly established Eighth Amendment right).

We must thus identify those whose motions for summary judgment should have been denied. BCI Agent Paul Bliss is shown to have been aware of the heat and the length and nature of Burchett's confinement. To be sure, Bliss did not himself place Burchett in the car; if Bliss had placed Burchett in the car, absent evidence to the contrary, we might presume that Bliss should have remained aware of the conditions of the detention throughout the investigation. However, Bliss

Burchett gave them notice, they immediately acted. Their actions handcuffing Burchett did not violate Burchett's constitutional rights.

Second, Burchett claims that his detention in the police car with the windows rolled up in ninety degree heat for three hours constituted excessive force. We agree that unnecessary detention in extreme temperatures, like those that could be reached in an unventilated car in ninety-degree heat, violates the Fourth Amendment's prohibitions on unreasonable searches and seizures. The Supreme Court has noted that under certain circumstances "unnecessary exposure to the heat of the sun, to prolonged thirst and taunting, and to a deprivation of bathroom breaks" can violate the Eighth Amendment's prohibition on "unnecessary and wanton infliction of pain." *Hope*, 122 S. Ct. at 2514. Such actions *a fortiori* violate the Fourth Amendment, which requires a showing of objective unreasonableness rather than any particular subjective motivation. *See Graham v. Connor*, 490 U.S. 386, 398 (1989).

Further, the government's interest in effecting the seizure in this case did not justify the imposition of extreme heat on the individual. The officers had many equally effective alternative ways of detaining Burchett that would not have subjected him to excessive heat, but their denial of his request that they roll down the windows to allow him air indicates a wanton indifference to this important safety factor. They could have left the windows slightly open, for example, or utilized the car's cooling or ventilation devices. If the detainee did spit upon officers or passers-by or otherwise disrupted the officers' search, and the officers could not otherwise effectively separate the detainee from passers-by, a reasonable officer might conclude that closing the windows was necessary. Resolving factual disputes in Burchett's favor, however, those circumstances were not present here. Thus we conclude that those responsible for detaining Burchett for three hours in ninety-degree heat with no ventilation violated his Fourth Amendment right against unreasonable seizures.

four times during that period, and that he once tried to calm Burchett by speaking with him in the car. Toward the end of the three hours, Sheriff Kiefer asked Burchett's wife and daughter to speak with Burchett and calm him down. The officers opened the window slightly for them to do so, at which point Burchett showed them that his hands were swollen and blue. Burchett's daughter pointed this out to Kiefer, who told Burchett that he would be released if he promised to behave. Burchett agreed, was let out of the car, and was released from the handcuffs. Burchett was given a citation for disorderly conduct, but the charges were later dismissed.

Burchett claims that he suffered physical and emotional injuries as a result of his detention. The detention in the heat caused extreme discomfort, and the handcuffs caused swelling, abrasions, and three or four days of missed work. He fears that police will "attack" him again, and his wife states that he has had nightmares since then. Burchett's wife also states that she has experienced mental anguish as a result of the incident.

Burchett and his wife filed this lawsuit on December 17, 1998, alleging violations of his Fourth Amendment right to be free from unreasonable search and seizure, his Sixth Amendment right to be informed of the nature and cause of the charges against him, and his Fourteenth Amendment rights to equal protection and not to be deprived of life, liberty, or property without due process of law. Burchett has added and dropped numerous defendants since the case was first filed, but at the summary judgment stage the following defendants remained: Sheriff Greg Kiefer, Deputy Sheriff R. H. Copas, and Deputy Sheriff Tony Robinson of the Jackson County Sheriff's Department, as well as BCI Agents Paul Bliss, Jon Dozer, Dennis Lowe, and William Morris.

All defendants moved for and were granted summary judgment. The district court noted that the defendants could be entitled to qualified immunity, but without reaching the question of whether the rights at issue were clearly

established or known by reasonable people, the court ruled that no constitutional violations had occurred. Because the Fourth Amendment does not prohibit police from detaining individuals present during a search in order to prevent flight, ensure safety, and protect evidence, and the district court found that the detention of Burchett was reasonable, it concluded that no Fourth Amendment violation occurred. The district court also apparently interpreted Burchett's Sixth Amendment claim to be a claim regarding his right to counsel. Because that right does not attach until the beginning of adversarial criminal proceedings, the court ruled that no Sixth Amendment right was violated.

## II. ANALYSIS

We review a district court's decision granting summary judgment de novo. *Gen. Elec. Co. v. G. Siempelkamp GmbH & Co.*, 29 F.3d 1095, 1097 (6th Cir. 1994). Summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). We must look beyond the pleadings and must assess the proof to determine whether there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In conducting the summary judgment analysis, we must view all inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. *See Gen. Elec. Co.*, 29 F.3d at 1097-98.

The Burchetts' claims must be evaluated under the framework of qualified immunity. According to the doctrine

First, we conclude that the officers did not use excessive force in handcuffing Burchett. The officers admit that they had to use force in restraining him, but "[n]ot every push or shove, even if it may later seem unnecessary . . . violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (quotation omitted). In fact, Burchett's own statements indicate that the initial force used to restrain him may have been necessary. Burchett acknowledged that he "twisted and turned some" when they tried to handcuff him and that the officers had difficulty restraining him. J.A. at 88 (Burchett Dep.). There is no genuine issue with respect to these facts, and the officers' use of force was reasonable.

The tightness of the handcuffs themselves causes greater concern. The right to be free from "excessively forceful handcuffing" is a clearly established right for qualified immunity purposes, *Kostrzewa v. City of Troy*, 247 F.3d 633, 641 (6th Cir. 2001), and applying handcuffs so tightly that the detainee's hands become numb and turn blue certainly raises concerns of excessive force. Our precedents allow the plaintiff to get to a jury upon a showing that officers handcuffed the plaintiff excessively and unnecessarily tightly and ignored the plaintiff's pleas that the handcuffs were too tight. *See id.*; *Martin v. Heideman*, 106 F.3d 1308, 1310, 1313 (6th Cir. 1997) (reversing directed verdict in favor of defendants on excessive force claim when plaintiff's hands were injured after thirty-five minutes in tight handcuffs).

Unlike the officers in *Kostrzewa* and *Martin*, however, the officers here did not ignore any plea that the handcuffs were too tight. To the contrary, Burchett complained only once, and on that occasion, Sheriff Kiefer immediately offered to remove the handcuffs if Burchett would behave. Burchett agreed, and the handcuffs were removed. The record gives no indication that Burchett had previously complained or advised the officers that the handcuffs were too tight. Kiefer's prompt response when Burchett finally did complain distinguishes this case from those in which we have found constitutional violations. Until they had notice that the handcuffs were too tight, the officers were unaware of the problem. Once

identified. Burchett's presence on the property line and his flight upon encountering the officers would suggest to a reasonable law enforcement official that he posed a similar risk of flight and danger to others as an individual who arrived at the premises during a search. *See Bohannon*, 225 F.3d at 616-17. That officers arrived and sought to detain him — in the most minimal sense, at first, by yelling for him to get down — while he was still one step away from the property line seems like an arbitrary distinction that would undermine the policies expressed in *Summers*.

We therefore conclude that the officers' detention of Burchett did not violate his Fourth Amendment rights.

## 2. The Officers' Use of Force Against Burchett

Claims regarding police officers' use of excessive force in the course of an arrest or other seizure are governed by the Fourth Amendment. *See Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The Fourth Amendment requires that an officer's use of force be objectively reasonable, and courts must balance the consequences to the individual against the government's interests in effecting the seizure. *See Graham*, 490 U.S. at 396. This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case. *See id.* Courts evaluating the reasonableness of force used "should pay particular attention to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Darrah v. City of Oak Park*, 255 F.3d 301, 307 (6th Cir. 2001) (quoting *Graham*, 490 U.S. at 396).

Questions of excessive force arise with respect to the officers' handcuffing of Burchett and their detaining him for three hours in an unventilated police car in extreme heat. We take the two in turn.

of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity involves a two-step inquiry. First, the court must determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. If the court finds a constitutional violation, it must then consider whether the violation involves "'clearly established constitutional rights of which a reasonable person would have known.'" *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996) (quoting *Christophel v. Kukulinsky*, 61 F.3d 479, 484 (6th Cir. 1995)); *see also Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). "Although it need not be the case that 'the very action in question has been previously held unlawful, . . . in the light of pre-existing law, the unlawfulness must be apparent.'" *Id.* (quoting *Anderson*, 483 U.S. at 640). As the Supreme Court noted in *Hope v. Pelzer*, __ U.S. __, 122 S. Ct. 2508, 2516-17 (2002), an action's unlawfulness can be apparent from direct holdings, specific examples described as prohibited, or from the general reasoning that a court employs.

## A. The Fourth Amendment Claims

The Burchetts argue that the officers' behavior violated Charles Burchett's Fourth Amendment right to be free from an unreasonable search and seizure. There is no question that Burchett's detention constituted a "seizure" within the meaning of the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1, 16 (1968) ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has

'seized' that person."). Burchett appears to raise two Fourth Amendment claims. First, he argues that the officers lacked the power to detain him at all. Second, he argues that in detaining him, the officers used an impermissible level of force.

### 1. The Officers' Power to Detain Burchett

In *Michigan v. Summers*, 452 U.S. 692 (1981), the Supreme Court ruled that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id.* at 705 (footnotes omitted). In *Summers*, police approaching a house to execute a search warrant saw the owner of the house leaving and detained him for the duration of the search. *Id.* at 693. The Court reasoned that such a detention was permissible even without probable cause, because inasmuch as it involved a limited detention at the individual's own residence it was not very intrusive, and because such a detention served several important police interests. Detaining such individuals prevented flight, minimized the risk of harm to officers and others, and facilitated the orderly completion of the search. *See id.* at 702-03. *Summers* detention does not require a finding of probable cause. *See id.* at 698-99.

We have extended police officers' powers under *Summers* in two important respects. First, in *United States v. Fountain*, 2 F.3d 656, 663 (6th Cir.), *cert. denied*, 510 U.S. 1014 (1993), *and overruled on other grounds*, *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 717 (6th Cir. 1999), this court ruled that the Supreme Court's discussion of "occupants" in *Summers* included nonresidents who are present at the scene of a search when police arrive. The court noted that two of the *Summers* factors applied equally to nonresidents who are present, because allowing police to detain such individuals would further *Summers*'s goals of preventing flight and minimizing the risk to officers. *See id.*

Second, in *United States v. Bohannon*, 225 F.3d 615, 616 (6th Cir. 2000), we ruled that officers could also detain

individuals who arrive at the scene of a search, even if they were not inside the residence or present when police first arrived. In *Bohannon*, officers were concluding their search and leaving the scene when a car pulled into the driveway of the residence at issue and two individuals walked from the car toward the residence. *See id.* at 616. The officers asked the first of them for identification and, when the other engaged in nervous behavior, patted down the second, found drugs, and arrested him. *See id.* Noting that the policies underlying *Summers* and *Fountain*, especially officer safety, applied equally to the detention of individuals arriving at a search scene, the court ruled that such a detention was not a violation of the Fourth Amendment. *See id.* at 617, *see also id.* (citing *Baker v. Monroe Township*, 50 F.3d 1186, 1192 (3d Cir. 1995) ("Although *Summers* itself only pertains to a resident of the house under search, it follows that the police may stop people coming to or going from the house if police need to ascertain whether they live there.")).

In the present case, Burchett neither was a resident of the searched premises nor arrived at the searched premises. Taken in the light most favorable to him, the record shows that Burchett remained on his own property at all times. Although he admittedly walked towards the property line — which the parties agree would place him just twenty-five feet away from his brother's house — in order to see what was going on, Burchett states that he remained on his own property. Inasmuch as *Bohannon* involved detainees who drove up the driveway, parked near the residence's front porch, and walked toward the residence, *see Bohannon*, 225 F.3d at 616, *Bohannon* does not control this case. Burchett never "arrived" at the searched premises.

Although the officers here were not within the strict limits of *Summers*, we hold that officers act within their *Summers* powers when they detain an individual who approaches a property being searched pursuant to a warrant, pauses at the property line, and flees when the officers instruct him to get down. Although this reaches beyond *Summers*'s "occupants" language, it is consistent with the policies that *Summers*