916 A.2d 245

**Randy Paul BROWN, Jr.**

v.

**STATE of Maryland.**

**No. 51, Sept. Term, 2006.**

Court of Appeals of Maryland.

Feb. 7, 2007.

Brian M. Saccenti, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), for petitioner.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent.

Argued before BELL, C.J., RAKER,*WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

RAKER, J.

Petitioner, Randy Paul Brown, Jr., was convicted in the Circuit Court for Anne Arundel County of possession with intent to distribute marijuana. The marijuana that formed the basis of petitioner's conviction was taken from him after he had been seized by law enforcement officials and admitted to having the drugs on his person. The issue we must decide in this case is whether the Circuit Court erred in denying petitioner's motion to suppress the marijuana and other contraband found in his possession as the inadmissible fruit of an unconstitutional seizure of the person. Specifically, we address whether it was reasonable for police to detain petitioner after he knocked on a door of a residence in which police were executing a search warrant. We shall hold that the seizure of petitioner was reasonable; it was justified by the officers' need to determine petitioner's identity and connection to the residence and to protect the officers' safety. We shall also hold that the Circuit Court's denial of petitioner's motion to suppress was not error.

I.

In November, 2003, the Anne Arundel County Police Department conducted an investigation into the residence located at 6415 Cedar Furnace Circle, Glen Burnie, Maryland. James William Miller had been identified by a confidential police

---

* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

informant as a drug dealer and was the target of the investigation. From the investigation, the police learned that drugs were sold from the residence and that customers would go to the house, knock on the door, enter, and obtain drugs inside the residence. Detectives Daniel DeVoe and T. Davis obtained a search and seizure warrant to search the house.

Around midnight on December 4, 2003, the police executed the search warrant at the residence. In the process of executing the warrant, police seized drugs and related paraphernalia. The following facts are gleaned from the hearing on petitioner's motion to suppress.

At approximately 1:00 a.m., while the police were still inside the house collecting and recording evidence, petitioner knocked on the door of the residence.[1] Detective DeVoe opened the door and saw a white male who was later identified as petitioner. Detective DeVoe testified at the suppression hearing that Brown took a step into the house, at which time DeVoe identified himself as a police officer and took Brown by the arm "to take him from the living room area to the kitchen area to keep him away from everybody else to figure out why he was at this residence." Before they reached the kitchen, DeVoe asked Brown if he had any weapons or drugs on him and Brown responded that he had "a quarter pound in his waist." The detective seized the clear bag containing a leafy substance tucked in Brown's waistband and placed him under arrest. Other officers searched Brown's car and recovered a similar green vegetable substance which they believed to be marijuana.

Petitioner testified at the suppression hearing. His version of the initial encounter at the door of the house differed from that of Detective DeVoe. Brown testified that after he

---

1. The police had arrested several people that were present in the residence and were in the process of transporting some of them to the police station. James William Miller, the target of the investigation, had been arrested, but there were still one or two people in the house, sitting on the couch in the living room on the other side of the front door.

knocked on the door, the officer pulled him into the house by his shirt. He testified that the officers started asking him questions, that he did not say anything to them, and that they searched him and patted him down.

Petitioner was indicted by the Grand Jury for Anne Arundel County and charged with several violations of the Controlled Dangerous Substances Act. Prior to trial, he filed a motion to suppress all evidence seized from his person and vehicle, claiming that the evidence was seized unlawfully. The court held an evidentiary hearing on the motion and denied the motion to suppress, reasoning as follows:

"And accepting some facts in the way that the Defendant would like me to accept the facts, I do agree with him that I think he had no choice but to come into the house one way or another.

On the other hand, I do agree with [the prosecutor] that at that point the police were justified in escorting him into the house whether he wanted to or not given the fact that he had just come up to the home where the search warrant was ongoing.

And the knowledge, and training, and experience of the officers when—not only when the search warrant was executed as being valid and its execution was apparently valid at the time in the middle of the night at the time that it happened in December of last year. So there is no question that I think he was fair game to at least address the reasons why he was there.

The thing to me, it turns on whether or not he voluntarily told them as an impulse at the time that he was ushered into the house and disclosed to them that I have no weapons, I have no drugs, or I do have drugs or no weapons, or whatever it was.

I think he was, without a doubt, was very startled when he walked into that circumstance or was escorted into that circumstance. At that point he realizes 6, 8, 10 officers around, whatever it was. They no doubt had the badges around their neck. And I think that was probably apparent.

They had guns. The Defendant didn't say anything about seeing a gun, but the idea of police officers being present one way or another would certainly imply that they would have weapons in that sort of scenario.

So I put myself in the standpoint of him at that time, the impulse of being put in that position. And I disagree with [the defense counsel] to the extent that they had to ask him first and politely well why are you coming here tonight in the middle of an executed search warrant.

When they have many officers involved, they have to be concerned about their own safety, not to mention the safety of people that are in the premises. They have got people lined up on the couch that are apparently in handcuffs. And I think skipping the formalities of asking why you are here I think was probably justified under the circumstances of the ongoing warrant. And to say do you have any weapons or drugs on you I don't think was inappropriate. He heard the question. And I sense from all of the circumstances of the case, the fact that he was cooperative afterward, the fact that he was cooperative not only afterward in the home, didn't cause a problem there, spoke with the policeman back in the kitchen, apparently, out of the area where the other folks were.

And then even cooperated back at the station after having Miranda warnings issued, admitted, again, as we said before, his role with the car, the fact that the backpack was his and what not.

And I just sense from all of this that being startled by that standpoint when asked impulsively do you have any weapons or drugs that he is the type of fellow that would have said yes, I do knowing that being in that position—although he only had a split second basically to make that decision or a couple of short seconds.

I believe, effectively, that the officer probably did ask him in the way that he did and that he volunteered very quickly yes, I do have these in his pants 'cause I think he knew that he was going to get searched or at least impulsively thought

that he may get searched anyway and he volunteered that information in the split second when he decided to think about his own safety maybe if nothing else.

But I believe in the context of that confrontation he volunteered that that information was there and that kind of set the stage for all the other things that occurred, which I think were proper in the case.

That is a difficult question, but, in effect, I believe the officer in his description of the facts happened more closely the way he said as opposed to the way Mr. Brown indicated. So for those reasons, I will deny the motion."

Petitioner entered a not guilty plea and proceeded to trial on an agreed statement of facts. The court convicted him of possession with intent to distribute marijuana, in violation of Md.Code (2002, 2006 Cum.Supp.), § 5–602 of the Criminal Law Article, and sentenced him to a term of incarceration for two years, without eligibility of parole.[2] Petitioner noted a timely appeal to the Court of Special Appeals.

The Court of Special Appeals affirmed. *Brown v. State,* 168 Md.App. 400, 896 A.2d 1093 (2006). We granted a writ of certiorari filed by petitioner to address the following questions:

"(1) Under *Cotton v. State,* 386 Md. 249, 872 A.2d 87 (2005), may the police detain a person who knocks on the door of a house an hour or so after the police entered it pursuant to a search warrant whenever the circumstances do not show that the person 'clearly [is] unconnected with any criminal activity and ... clearly present[s] no potential danger,' or only if the State demonstrates that the police had individualized reasonable articulable suspicion or that the law enforcement interests outweighed those of the individual?

---

**2.** At the time of his arrest, petitioner was on probation for another offense of possession with intent to distribute. As such, he was subject to a mandatory minimum sentence of two years without the possibility of parole. Md.Code (2002, 2006 Cum.Supp.), § 5–607 of the Criminal Law Article.

(2) If *Cotton* requires that the police have individualized reasonable articulable suspicion or that the law enforcement interests outweigh those of the individual before the police may detain such a visitor, were the police justified in detaining petitioner, who knocked on the door of a house an hour or so after the police entered it when they were in the process of transporting arrestees and cataloging evidence, and where there was no indication that petitioner was connected to the residence or the drug activity?"

*Brown v. State,* 394 Md. 307, 905 A.2d 842 (2006).

## II.

Brown presents one argument—that his detention was unlawful. He argues that the police violated his right to be free from an unreasonable seizure when they detained him while they executed a search warrant. According to Brown, under *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the rule that law enforcement officers have limited authority to detain "occupants" present on the premises during the execution of a valid search warrant does not apply to him because he was not a resident nor an occupant of the home. Therefore, he argues, his detention was an unlawful arrest because it was not supported by probable cause or reasonable articulable suspicion, and the subsequent search and seizure of the marijuana from his waist was not admissible into evidence.

The State argues that the term "resident" or "occupant," as that term is used by the Supreme Court in *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340, and further explicated in *Cotton v. State,* 386 Md. 249, 872 A.2d 87 (2005), is not limited to "resident," and that the Circuit Court found properly that Brown's detention was reasonable under the Fourth Amendment. Alternatively, the State argues that the police had reasonable, articulable, suspicion to believe that petitioner w as involved in criminal activity.

## III.

In reviewing the lower court's ruling of a motion to suppress evidence, we look only to the record of the suppression hearing and we do not consider any evidence adduced at the trial. *Myers v. State*, 395 Md. 261, 274, 909 A.2d 1048, 1055 (2006); *Ferris v. State*, 355 Md. 356, 368, 735 A.2d 491, 497 (1999). We extend great deference to the findings of the motions court as to first-level findings of fact and as to the credibility of witnesses, unless those findings are clearly erroneous. *Ferris*, 355 Md. at 368, 735 A.2d at 497. We view those findings in the light most favorable to the prevailing party. *Myers*, 395 Md. at 274, 909 A.2d at 1055. In determining whether the search or seizure was reasonable, we review the court's legal conclusions *de novo* and exercise our independent judgment as to whether an officer's encounter with a criminal defendant was lawful. *Id.*

## IV.

The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." *See Mapp v. Ohio*, 367 U.S. 643, 655–657, 81 S.Ct. 1684, 1691–92, 6 L.Ed.2d 1081 (1961). An essential part of the protections under the Fourth Amendment is the exclusion of evidence obtained in violation of the Amendment. Id. at 648, 81 S.Ct. at 1688. Although the alleged conduct may also violate the Maryland Declaration of Rights, because there is no general exclusionary provision in Maryland for such violations, the conduct must violate the federal Constitution to be excluded. *See Fitzgerald v. State*, 384 Md. 484, 507, 864 A.2d 1006, 1019 (2004) (citing *Chu v. Anne Arundel County*, 311 Md. 673, 537 A.2d 250 (1988)).

We have noted, as have many other courts, that there are basically three categories of police contacts with individuals, with differing levels of intrusion. *Swift v. State*, 393 Md. 139, 149–51, 899 A.2d 867, 873–74 (2006). The least

intrusive encounter is a consensual encounter, which involves no restraint of liberty at all and which may be initiated by police officers without any justification whatsoever. *See United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). Second, there are those seizures of an individual, known as detentions, that are limited in duration, scope and purpose and may be undertaken by the police if there is articulable suspicion that a person has committed or is about to commit a crime. *See Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984). The third level are those seizures that exceed the permissible limits of a detention, which include formal arrests and restraints on a person's liberty comparable to an arrest, and which must be supported by probable cause to arrest for a crime. *See Florida v. Royer,* 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983).

The trial court found that petitioner was detained after he knocked on the front door of the house and this finding is not clearly erroneous. A person has been detained by the police "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (internal citations and quotations omitted). Petitioner's freedom was restrained and he was not free to leave. Moreover, the State does not dispute that petitioner was detained and following the search of his person after he entered the residence, that he was arrested.

The modern cases interpreting the Fourth Amendment make clear that "the key principle of the Fourth Amendment is reasonableness—the balancing of competing interests." *Dunaway v. New York,* 442 U.S. 200, 219, 99 S.Ct. 2248, 2260, 60 L.Ed.2d 824 (1979) (White, J., concurring). To determine if petitioner's detention was lawful, the starting point for our analysis is the Supreme Court case of *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340, and our recent case of *Cotton v. State,* 386 Md. 249, 872 A.2d 87.

The United States Supreme Court considered the issue of whether a person on the premises where the police are in the process of executing a search warrant may be detained on less than probable cause. In *Summers,* the Supreme Court held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Summers,* 452 U.S. at 705, 101 S.Ct. at 2595. Detention of the occupants or residents is justified (1) because a judicial officer has authorized the police to enter the residence, based on probable cause to believe that the location contains evidence of crime, and (2) by the need of the officers to protect themselves from attack while they are executing the warrant, and to prevent the occupants from concealing or disposing of the items described in the search warrant. *Id.* at 702–05, 101 S.Ct. at 2594–95. The Court held that "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Id.* at 702–03, 101 S.Ct. at 2594.

The clear rule that emerges from *Summers,* in the words of Professor LaFave, "is that police may *always* detain persons found at the premises named in a search warrant, provided (i) the warrant authorizes a 'search for contraband' and (ii) the persons detained are 'occupants.'" 2 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 4.9(e), at 726 (4th ed.2004) (emphasis in original). *See also Muehler v. Mena,* 544 U.S. 93, 98, 125 S.Ct. 1465, 1470, 161 L.Ed.2d 299 (2005) ("An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" (quoting *Summers,* 452 U.S. at 705, n. 19, 101 S.Ct. at 2595, n. 19)). The significance of this "standardized procedure," as explained by Professor LaFave, is that even though the Supreme Court *could* have adopted an *ad hoc,* case by case approach, requiring an analysis of whether an officer had reasonable suspicion to believe that the person has committed or was about to commit a crime, the Court "has opted for a standardized procedure to avoid the necessity of case-by-case decisionmak-

ing by police and courts." 2 LaFave, *supra* at 726. The rule works well when the person detained is an owner of the residence or one who actually lives at the house. Problems arise when the person detained is a visitor or bystander.

Notwithstanding a desire to set out a bright-line rule in *Summers,* the case has spawned questions, particularly as to the meaning or limitation of the terms "occupant" or "resident" as used in the opinion. Because *Summers* used the words "resident" and "occupant" interchangeably, courts have taken different approaches to the authority of police to detain a person who is not an owner, tenant, or one who has no possessory interest in the place to be searched. Two cases in Maryland have addressed the issue—*Stanford v. State,* 353 Md. 527, 727 A.2d 938 (1999) and *Cotton,* 386 Md. 249, 872 A.2d 87.

Writing for this Court in *Stanford,* Judge Cathell identified the three approaches taken by courts that have considered this issue. *Stanford,* 353 Md. at 535, 727 A.2d at 942. Some courts have held that *only* the actual resident of a home may be detained while a search is ongoing. *Id.* Others have found that a non-resident may be detained if law enforcement officials "can point to reasonably articulable facts that associate the visitor with the residence or the criminal activity being investigated in the search warrant." *Id.* at 536, 727 A.2d at 943. Finally, some courts, interpret the term "occupants" broadly, allowing detention of all persons located at a residence being searched pursuant to a warrant. *Id.* at 537, 727 A.2d at 943. Because the detention in *Stanford* was unreasonable under any of these interpretations, we did not resolve the issue as to which standard to adopt. *Id.* at 538, 727 A.2d at 944.

In *Cotton,* we revisited the debate over detention of persons appearing at a residence where a search warrant is being executed. We concluded that, subject to further guidance from the United States Supreme Court, some synthesis of the second two approaches identified in *Stanford* was more consistent with recent jurisprudence and represented a more rea-

soned and practical solution. *Cotton,* 386 Md. at 257, 872 A.2d at 92. *Cotton* involved the execution of a warrant at an open-air drug market. The warrant authorized the police to search the residence and any outbuildings and motor vehicles located on the property, to search several named individuals, to search any persons participating in violations of drug laws, to seize evidence, and to arrest all persons participating in violations of drug laws. At the time police arrived to execute the warrant, Cotton was standing in the front yard of the house. Although Cotton was neither named in the warrant, nor was he visibly violating any drug laws at the time, the police handcuffed and detained him while they secured the scene. The police read him his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and then asked him "if he had anything on him." Cotton responded that he had a bag of marijuana on him and the police seized the drugs. That evidence formed the basis of a charge against Cotton for possession of marijuana. On appeal, Cotton argued that he was a mere bystander who happened to be at the house when the police came to execute the warrant and that they had no lawful authority to detain him without probable cause to believe that he had committed a crime.

We held that Cotton's detention was reasonable and that the marijuana was admissible at trial. Like the Supreme Court, we attempted to set out essentially a "standardized procedure," focusing primarily upon the safety of the police officers executing the warrant and on others in close proximity. Judge Wilner, writing for the Court, stated as follows:

"It follows, from *Summers* and *[Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) ], that, in executing a warrant such as that issued here, for a premises known to be an open-air drug market where the police are likely to encounter people who may well be dangerous, they are entitled, for their own safety and that of other persons, to take command of the situation and, *except for persons who clearly are unconnected with any criminal activity and who clearly present no potential danger,* essentially immobilize everyone until, acting with reasonable expedi-

tion, they know what they are confronting. It really cannot be otherwise. The police do not know who may be at the scene when they arrive. The people they find there, in or on the property to be searched, are not wearing identifying labels—supplier, customer, processor, bodyguard, innocent bystander. It would be decidedly *unreasonable* to expect the police simply to give a friendly greeting to the folks there and proceed to search the house without another thought as to who those people are or what they may do. Indeed, the Supreme Court has specifically warned against the very kind of 'unrealistic second-guessing' of police officers that Cotton and the Dissent insist be done in assessing investigative detentions. *See United States v. Sharpe,* [470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985) ]."

*Cotton,* 386 Md. at 258–59, 872 A.2d at 92–93 (emphasis added).

■■■ The question in the instant case then becomes: Was it clear to the police executing the search warrant that petitioner, when he knocked on the door, was a person clearly unconnected with any criminal activity or one who clearly presented no potential danger? Cotton has resolved the issue in this case and provides the answer: the answer is the same as the view of the Court of Special Appeals—a resounding NO.

The salient facts are significant in our analysis. Petitioner knocked at the door of a home which had been the subject of a drug investigation—not an "open-air drug market" as in *Cotton,* but instead a "closed-air drug market." The police officers had information that drugs had been distributed from the home on several occasions and they were in the process of executing a valid warrant to search for drugs. While executing the warrant, at 1:00 a.m., there was a knock on the front door. When the officers opened the door in response to the knock, they were entitled, at a minimum, to take control of the situation to ascertain petitioner's identification and his connection, if any, to the residence. As the Court of Special Appeals stated, "it would be unrealistic to conclude that appellant's 1:00 a.m. arrival at the residence (1) was *clearly* unconnected

with the criminal activity, and/or (2) *clearly* presented no potential danger to the officers involved in the post-execution procedures related to the seizure of contraband from the premises described in the warrant." *Brown,* 168 Md.App. at 409, 896 A.2d at 1098 (emphasis in original). The detention was lawful under *Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340, and *Cotton,* 386 Md. 249, 872 A.2d 87.

Other courts have interpreted *Summers* in the same fashion. In *United States v. Bohannon,* 225 F.3d 615 (6th Cir. 2000), James Bohannon drove up the driveway of a home while the police were executing a search warrant. He walked quickly towards the residence when he was stopped by law enforcement agents. The United States Court of Appeals for the Sixth Circuit considered the authority of law enforcement officers who were executing a search warrant at a residence to detain him. The court held that even though Bohannon was not a resident of the house and was not inside the house, the detention was lawful. The court reasoned as follows:

"In the present case, James was not a resident of the premises being searched. However, agents' authority to detain citizens has been extended. In *United States v. Fountain,* 2 F.3d 656 (6th Cir.1993), this court held that detention of the defendant, who did not live at the residence that was being searched, was constitutional because two of the justifications for detaining residents still existed. The court stated that the search was necessary for the safety of the agents and 'reasonable and proportional to law enforcement's legitimate interests in preventing flight in the event incriminating evidence is found.' *Id.* at 663. The court declared that those concerns are the same whether or not the person detained is a resident of the premises being searched. *Id.* Therefore, it is irrelevant that James was not a resident.

The present case is also different from *Summers* in that James was not inside the residence. However, this fact does not make the search of James unconstitutional. As the Third Circuit concluded, '[a]lthough *Summers* itself only pertains to a resident of the house under search, it follows

that the police may stop people coming to or going from the house if police need to ascertain whether they live there.' *Baker v. Monroe Township,* 50 F.3d 1186, 1192 (3d Cir. 1995). The policy justifications of *Summers* and *Fountain,* especially to protect officers' safety, are applicable in this case. 'The possible danger presented by an individual approaching and entering a structure housing a drug operation is obvious. In fact, it would have been foolhardy for an objectively reasonable officer not to conduct a security frisk under the circumstances.' *United States v. Patterson,* 885 F.2d 483, 485 (8th Cir.1989). Furthermore, because James showed every intention of walking into the house where armed officers were in the process of completing the search, his safety was also at risk. Preventing his unexpected entry into the trailer was for the safety of everyone involved."

*Bohannon,* 225 F.3d at 617. Our decision in *Cotton* is based upon similar reasoning.

***JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.***

BATTAGLIA and GREENE, JJ. join in the judgment only.

BELL, C.J., dissents.

Dissenting Opinion by BELL, C.J.

I dissent.

I adhere to the views expressed in the dissenting opinion in *Cotton v. State,* 386 Md. 249, 872 A.2d 87 (2005).